UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 23-17 |
| KODY SEVERIN | SECTION M (4) |

### ORDER & REASONS

Before the Court is a motion to suppress evidence filed by defendant Kody Severin,[1] to which the government responds in opposition.[2] The Court held a suppression hearing on December 4, 2025. The government presented the testimony of Special Agent Vincent Liberto of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). With leave of court, Severin filed a post-hearing memorandum with an additional exhibit in support of his motion.[3] Having considered the parties' memoranda, the evidence presented at the hearing, the record, and the applicable law, the Court denies the motion because it finds that B.R. validly consented to a search of the areas inside the residence at 1419 Milan Street, apartment 205, from which law enforcement recovered the evidence at issue.

### I. BACKGROUND

On December 12, 2022, Severin's ex-girlfriend, B.R., went to the New Orleans Police Department ("NOPD") Eighth District station and filed a complaint of domestic violence, aggravated assault, and sexual assault against Severin.[4] As part of this complaint, she reported to the NOPD that Severin owned several firearms, explosive devices, and machine-gun conversion

---

[1] R. Doc. 103.
[2] R. Doc. 108.
[3] R. Doc. 110.
[4] R. Docs. 103-1 at 1; 103-2 at 2.

devices, colloquially known as "glock switches."[5] The NOPD notified the ATF of B.R.'s report, and Liberto and ATF Special Agent Justin Amacker responded to the NOPD Eighth District station, where they interviewed B.R.[6]

During the interview, B.R. explained to the ATF agents that she and Severin had been in an on-again-off-again relationship for about two years that was, at times, physically abusive.[7] The agents noted that B.R. had bruising around her right eye.[8] B.R. also reported that Severin would sometimes sell marijuana in and around the French Quarter from a golf cart, while armed with a black revolver with a wooden grip handle.[9] Liberto testified at the hearing that B.R. stated in the interview that Severin's golf cart had a "Politics" sticker on it. B.R. also told Liberto and Amacker that Severin stored the guns and explosives inside two closets in her apartment, where Severin also kept clothing and other personal items.[10] She was unsure whether the machine-gun conversion devices and narcotics were still in the closet as well.[11] B.R. said that she previously asked Severin to remove the items on multiple occasions, but he had not complied.[12]

At the time, B.R. resided with her daughter at 1419 Milan Street, apartment 205.[13] B.R. informed the agents that the lease for the unit was in her name and that she paid the utilities for the apartment.[14] Liberto testified at the hearing that B.R. told officers that Severin could access her apartment because he had a key to it. She explained to the agents that earlier in their relationship, Severin stayed at the apartment on a nearly full-time basis, but as the relationship progressed,

---

[5] R. Docs. 103-1 at 1; 108 at 1.
[6] R. Doc. 103-3 at 1.
[7] Id.
[8] Id.
[9] Id.
[10] Id. at 2.
[11] Id.
[12] Id.
[13] R. Doc. 108 at 1-2. At the hearing, Liberto testified that B.R. had a daughter who lived with her at the residence.
[14] R. Doc. 103-3 at 2.

Severin stayed at the apartment less frequently and traveled often. When B.R. made her report, Severin was still staying at the apartment with some frequency, left his belongings and clothing there, and received mail there. Prior to filing her report, B.R. asked Severin to remove his belongings multiple times, but he did not comply.[15] Liberto also testified that B.R. told the agents that she attempted several times to get her apartment key back and remove his access to the unit, but her attempts were unsuccessful because Severin made multiple copies of the key.

Based on the information B.R. gave Liberto during the interview, Liberto requested B.R.'s consent to search her apartment.[16] B.R. signed the standard ATF consent-to-search form, which gave law enforcement consent to search apartment 205 of the complex located at 1419 Milan Street.[17] At the hearing, Liberto testified that he informed B.R. that during the search, law enforcement would gather the items she identified to them and search her apartment for other items she may not have been aware of when filing her report. He testified that she was not forced to sign the form. He further testified that, at the time he requested consent, B.R. was nervous but coherent, and she understood what the officers asked. The consent-to-search form she signed informed B.R. that she had the right to refuse to give consent to a search, the right to demand that law enforcement obtain a search warrant prior to any search of the premises, the right to consult with an attorney before or during the search, and the right to withdraw her consent to the search at any time.[18] The form also advised her that any contraband or evidence of a crime found during the search could be used against her in court.[19] The form also included an attestation that B.R.'s "consent to search

---

[15] *Id.*
[16] *Id.*
[17] *Id.*; R. Doc. 103-2 at 1.
[18] R. Doc. 103-2 at 1.
[19] *Id.*

ha[d] been given voluntarily without promises, threats, coercion or force of any kind whatsoever."[20]

After the ATF agents concluded their interview with B.R. at the NOPD station, B.R. went with ATF personnel, task force officers, and NOPD officers to her apartment and opened the door for them to conduct their search.[21] Liberto testified that, because law enforcement was unaware whether Severin was at the apartment and had reason to believe Severin could be armed if present, law enforcement first entered the apartment with guns drawn to render the apartment safe. B.R. was near the front door to the apartment while law enforcement rendered it safe. Liberto testified that after law enforcement determined Severin was not present, B.R. and a friend entered the apartment, and B.R. guided the officers to the items she said belonged to Severin. B.R. and her friend remained present in the apartment for the entire search. According to Liberto, during the search, B.R. never limited the search in any way or asked officers not to enter any particular room or area of her apartment. She asked questions to law enforcement, and she answered the questions law enforcement asked her about the items seized. Liberto testified that B.R. recognized much of the contraband which law enforcement seized from the apartment during the search, but law enforcement also seized some contraband which, prior to the search, B.R. was unaware Severin stored in the apartment. As a result of the search, the ATF seized 40 pieces of evidence, including guns, ammunition, explosive devices, marijuana, and other miscellaneous paraphernalia from the bedroom closet, the living room closet, a kitchen cabinet, and the bedroom nightstands of the residence at 1419 Milan Street, apartment 205.[22]

---

[20] *Id.*
[21] R. Doc. 103-3 at 2.
[22] *Id.* at 2-3 (itemized list of all evidence seized from BR's apartment).

At the suppression hearing, Liberto described the bedroom closet, the living room closet, and the kitchen cabinets inside the apartment. First, he explained that the bedroom had two closets, and in one of the closets, the officers found male clothing, several firearms and silencers, and a laundry basket containing a firearm, marijuana, numerous magazines, and rounds of ammunition. The closet also contained mail and documents in Severin's name, law enforcement paraphernalia including placards and holsters, "Politics" stickers like those B.R. said were on the golf cart Severin used when he sold marijuana, and a "Politics" bag. In addition, Liberto said that agents recovered a bag containing two explosive devices from the closet. Liberto testified that this bedroom closet had not been locked or secured in any way and had no barrier to entry other than an unlocked door. He said that none of the items recovered from the bedroom closet had been kept in a closed container, safe, or lock box.

Liberto next explained that the living room closet was located immediately to the left of the front door upon entry to the apartment. In the closet, Liberto said they found a large wooden crate which contained a device used to manufacture firearms, silencers, and machine-gun conversion devices. Finally, Liberto explained that, in a kitchen cabinet, law enforcement discovered around 100 additional gun parts.

After the search concluded, B.R. wrote out a statement for ATF disclaiming ownership of the guns, ammunitions, explosives, and drugs that were in her apartment, claiming they all belonged to Severin.[23]

On November 14, 2025, the grand jury returned a third superseding indictment, charging Kody Severin with eight counts: possession with the intent to distribute marijuana, possession of firearms in furtherance of a drug trafficking crime, two counts of felon in possession of a firearm,

---

[23] R. Doc. 103-2 at 2.

possession of machine guns, possession of unregistered firearms, attempt to obstruct justice, and receipt of explosive materials.[24] On November 20, 2025, Severin filed a motion to suppress the evidence seized from B.R.'s apartment.[25] Trial in this matter is currently set for December 15, 2025.

## II. PENDING MOTION

In his motion to suppress, Severin argues that the December 12, 2022 search of B.R.'s apartment was conducted in violation of his Fourth Amendment rights.[26] He concedes that B.R. had authority to consent to the search of her apartment generally, but he claims B.R.'s "consent did not extend to the closets or any storage space containing Severin's personal possessions."[27] This is so, he submits, because the locations within B.R.'s apartment from which the ATF seized the evidence were not common areas and were not subject to B.R.'s control.[28] Severin claims that B.R.'s failure to remove the contraband from the areas where it was found and her statement to the ATF agents that she was not responsible for any of the items seized indicate that B.R. had no control over the areas searched.[29] Thus, says Severin, B.R. could not consent to a search of those areas, so the search violated Severin's Fourth Amendment rights, and the evidence obtained from the unlawful search must be excluded.[30]

In its opposition, the government argues that the search of B.R.'s apartment was lawful because she validly consented to a search of the entire premises. In support, it submits that B.R. granted law enforcement explicit consent to search the apartment when she approached them to

---

[24] R. Doc. 99 at 1-4. Severin was originally indicted on January 26, 2023. R. Doc. 17. He was charged by superseding information on October 3, 2025. R. Doc. 71. He was again indicted in a second superseding indictment on October 17, 2025. R. Doc. 76.
[25] R. Doc. 103.
[26] *Id.*
[27] R. Doc. 103-1 at 4.
[28] *Id.* at 6.
[29] *Id.*
[30] *Id.*

6

report a crime or crimes and then signed the ATF consent-to-search form.[31] The government then says that B.R.'s consent was voluntary under the totality of the circumstances given that "five (5) of the six (6) factors [used to determine the voluntariness of a party's consent to a warrantless search] clearly favor a finding of voluntariness."[32] It next asserts that B.R. possessed actual authority to consent to the search of her apartment, as she was the leaseholder for the unit and paid the utility bills.[33] The government points out that, where there is common authority to consent to search, the consent of one person with authority is valid against the other person with common authority, even if they are absent or non-consenting.[34] Finally, it argues that the search was within the scope of B.R.'s consent because she explicitly consented to a search of the entire apartment, and she never withdrew or limited the scope of her consent, even though she remained present for the entire search.[35] The government says that whether B.R. took any steps to remove Severin's contraband from her apartment is not determinative of whether she had authority to consent because the only relevant consideration "is B.R.'s status as the apartment's leaseholder who enjoyed unfettered access to its entirety."[36] The government then submits that, because Severin did not keep his belongings behind lock and key, as would prevent B.R.'s access to them, he assumed the risk that B.R. might report the belongings to law enforcement.[37]

### III.   LAW & ANALYSIS

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "The exclusionary rule, a judicially created deterrence measure, provides that evidence obtained

---

[31] R. Doc. 108 at 4-5.
[32] *Id.* at 5-7 (quote at 7).
[33] *Id.* at 7-8.
[34] *Id.*
[35] *Id.* at 8-9.
[36] *Id.* at 9-10 (quote at 9).
[37] *Id.*

by an unreasonable search or seizure generally may not be used as evidence of guilt at trial." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022). "'The proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights.'" *United States v. Garcia*, 99 F.4th 253, 267 (5th Cir. 2024) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)). To meet this burden, the movant must first establish that a search has occurred. Then, "'if a search has in fact occurred, the movant must show that the government intrusion was unreasonable given the particular facts of the case.'" *Id.* (alteration omitted) (quoting *Smith*, 978 F.2d at 176). "Warrantless searches and seizures are *per se* unreasonable subject to certain narrow exceptions." *Alvarez*, 40 F.4th at 345. Thus, when a warrantless search or seizure is at issue, the burden shifts to the government to show that an exception applies. *Id.*

"Valid consent to search is a well-established exception to the normal requirement that law enforcement officers must have a warrant grounded in probable cause before conducting a search." *United States v. Shelton*, 337 F.3d 529, 532 (5th Cir. 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). The government bears the burden of proving consent by a preponderance of the evidence. *See United States v. Michalik*, 5 F.4th 583, 589 (5th Cir. 2021). Consent is valid when it is voluntarily given by a person with actual or apparent authority over the premises sought to be searched. *United States v. Staggers*, 961 F.3d 745, 757 (5th Cir. 2020). Additionally, to be lawful, the government's warrantless search may not exceed the scope of the consent. *Id.*

### A. Whether B.R. Gave Consent to Search the Apartment

Consent to a search can be made expressly or impliedly. *Id.* In this case, B.R. explicitly consented to the search in writing when she signed the ATF's consent-to-search form. Severin

8

does not argue that B.R. did not give explicit consent to law enforcement. As such, this Court finds that B.R. gave express consent to search her apartment.

### B. Whether B.R.'s Consent to Search the Apartment Was Voluntarily Given

To determine whether consent to search was given voluntarily, courts look to the totality of the circumstances. *Id.* at 759. Analysis of the totality of the circumstances considers six factors, no single one of which is dispositive. *See United States v. Asibor,* 109 F.3d 1023, 1038 (5th Cir. 1997); *see also United States v. Glenn*, 931 F.3d 424, 430 (5th Cir. 2019) (finding that a district court did not err in determining an individual's consent was given voluntarily, even though some of the factors weighed against voluntariness). The six relevant factors are:

> (1) the voluntariness of the [individual]'s custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the [individual]'s cooperation with the police; (4) the [individual]'s awareness of his right to refuse consent; (5) the [individual]'s education and intelligence; and (6) the [individual]'s belief that no incriminating evidence will be found.

*Staggers*, 961 F.3d at 759.

The Court finds that, under the totality of the circumstances, B.R.'s consent was voluntarily given. The first five factors plainly indicate that B.R.'s consent was voluntary. First, she voluntarily went to the NOPD station to report the crime, and she was never handcuffed or detained in any way. Second, she signed the ATF consent-to-search form which states that her consent was given "without promises, threats, coercion or force of any kind whatsoever." And no evidence of coercion was adduced. Third, she cooperated extensively with law enforcement when making her report and during the search. Fourth, the ATF consent-to-search form also indicated that she explicitly understood she had the right to refuse to give consent to the search. Fifth, while B.R. only has an eighth-grade education, there is no evidence that she is unintelligent. Liberto testified that, although B.R. had been nervous, she appeared to understand the consent-to-search form and law enforcement's explanation of her rights and the search procedure.

The sixth factor, the individual's belief that no incriminating evidence will be found, is at the very least neutral with respect to voluntariness. Traditionally, courts ask whether "the defendant" – that is, the person charged with the crime – had any belief that law enforcement would recover incriminating evidence. *See id.* The government, in its opposition, notes that at least one court has applied the sixth factor to an uncharged third party who consented to a search. *See United States v. Moore*, 2025 WL 2715262, at *11 (W.D. La. Sept. 8, 2025), *adopted*, 2025 WL 2715489 (W.D. La. Sept. 23, 2025). If this factor cannot be assessed against B.R. as an uncharged third party, then it does not weigh against voluntariness. And if it can be assessed against B.R. as an uncharged third party, this Court finds that this factor does not weigh against voluntariness based on the facts of the case. It is true that B.R. knew that incriminating evidence would be found inside the apartment, which might typically weigh against voluntariness. However, the Court finds it highly relevant that B.R.'s goal in consenting to the search was for law enforcement to find the incriminating evidence and facilitate its removal from her apartment. She filed a report against Severin because she felt unsafe with him, due in part to his insistence on keeping firearms and explosive devices at her apartment.

Therefore, given that five factors weigh heavily in favor of voluntariness, and one factor is neutral, the Court finds that, under the totality of the circumstances, B.R.'s consent was voluntary.

### C. Whether B.R. Had Authority to Consent

Consent is valid only where it is given by an individual with actual or apparent authority to consent. *Staggers,* 961 F.3d at 757. Where the consent to search is given by a third party rather than by the defendant, "[a]ctual authority exists when the third party and the defendant 'mutually used the property searched and had joint access to and control of it for most purposes.'" *Id.* at 760 (quoting *United States v. Iraheta*, 764 F.3d 455, 463 (5th Cir. 2014)). This shared or "common

authority" is also present where "'it is reasonable to recognize that any of the co-inhabitants has … assumed the risk that one of their number might permit the common area to be searched.'" *Shelton*, 337 F.3d at 532 (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974)). Where two parties exercise such "common authority" over a premises, either party's consent to a search by law enforcement is effective as to the other individual, even if the other individual is absent or otherwise does not consent. *Shelton*, 337 F.3d at 532; *see also Matlock*, 415 U.S. at 171 & n.7.

The Court finds that B.R. had actual authority to consent to the search of her apartment. At the suppression hearing, the government acknowledged that Severin had joint access to the apartment. Still, it is not disputed that B.R. was the leaseholder of the apartment, that she lived there, and that she paid for the utilities. At the very least, then, B.R. jointly used the property, having access to it and control of it, such that she had actual authority to consent to a search of the apartment. Even though Severin also had access to the apartment, B.R.'s consent is not invalidated simply because he was not present in the apartment at the time of the search. *Shelton*, 337 F.3d at 532; *Matlock*, 415 U.S. at 171.

Severin argues that B.R.'s lack of authority to consent to a search of the areas in which he stored his illicit belongings is evidenced by her failure to remove them on her own, even though she wanted them out of the apartment. That B.R. may have elected not to access or remove the items does not deprive her of authority to consent to a search of areas within her own apartment that she could freely access. Instead, it may simply reveal her good sense in not wanting to handle such dangerous items. In storing his possessions in unlocked closets and cupboards which B.R. could access, Severin "'assumed the risk that [B.R.] might permit the common area to be searched.'" *Shelton*, 337 F.3d at 532 (quoting *Matlock*, 415 U.S. at 171 n.7).

11

In his motion, Severin also cites two cases from the Fourth Circuit Court of Appeals to argue that B.R. did not have authority to consent to the search. He first cites *United States v. Kinney*, 953 F.2d 863, 866 (4th Cir. 1992), in which the court held that a joint resident of an apartment lacked actual authority to consent to the search of a closet in the shared apartment which the other resident kept "locked at all times," and which the consenting resident did not mutually use and could not generally access. The facts of Severin's case, however, are distinguishable from *Kinney*. The consenting resident in *Kinney* was excluded from accessing the closet, as the non-consenting resident kept the closet locked. *Id.* The only reason the consenting resident in *Kinney* could access the closet for the search was because she had "surreptitiously obtained the keys from Kinney [the non-consenting resident] while he slept." *Id.* at 867. Thus, the facts upon which the decision in *Kinney* turned – specifically, locked doors and the co-resident's "surreptitious" conduct – are simply not present in this case. Liberto testified that there were no locks or barriers that would have prevented anyone other than Severin from accessing the closets or cabinets. Unlike the consenting resident in *Kinney*, there is no evidence that B.R., the leaseholder, was excluded from the areas where Severin stored his illicit belongings.

Severin next cites *United States v. Block*, 590 F.2d 535, 540, 542 (4th Cir. 1978), in support of his motion. In *Block*, the court held that a mother whose son resided in a bedroom in her home could not consent to a search of a footlocker inside her son's bedroom. *Id.* at 541. The son kept the footlocker locked. *Id.* at 537. Before the officers opened it, the mother explained that the footlocker was not hers, but her son's. *Id.* Because the footlocker had generally been locked, officers had to use "sufficient force of some kind over a period of several seconds" to open the footlocker. *Id.* In finding that the mother did not have authority to consent to the search, the court noted that the officer's assumption that the mother could consent to a search of her son's footlocker

12

was unreasonable considering the specific circumstances: "the police here specifically confronted a secured container that required force to open and a custodian-owner of the general premises who both asserted the absent person's claim of privacy over it and disclaimed for herself any shared right of access to it." *Id.* at 541.

Again, the circumstances in *Block* which deprived the mother of authority to consent to a search of her son's footlocker are not present in Severin's case. B.R.'s apartment closets and cabinets, which are integral parts of her apartment, are easily distinguishable from the footlocker in *Block*, which was a discrete storage unit owned outright by the non-consenting party and kept locked at all times. Severin stored his illicit items in the unlocked closets and cabinets of B.R.'s apartment. The items were not in closed containers. B.R. could freely access the items if she so chose. The manner in which Severin stored his illicit belongings did not indicate that he had retained any expectation of privacy in the areas where the items were located. He did not exclude B.R. from the areas, and thus he assumed the risk that she would permit law enforcement to inspect those areas.

Unlike the mother in *Block*, B.R. did not "disclaim[] for herself any shared right of access to [the areas searched]." *Id.* Severin argued at the suppression hearing that B.R. thought the closets in B.R.'s apartment belonged to Severin, so her consent could not have been valid. When pressed by the Court for evidence of such claim, Severin offered to submit the evidence in a post-hearing memorandum. The evidence which Severin submitted, however, states only that B.R. "described Severin's firearms and explosives were located inside two closets within her apartment."[38] It does not indicate that B.R. thought Severin owned the closets themselves – only that he owned the items

---

[38] R. Doc. 110-1 at 2.

within the closets. Therefore, this Court does not find that the additional evidence Severin submitted indicates that B.R. lacked authority to consent to a search of the closets.

In sum, B.R. was the leaseholder of the apartment. Severin did not lock, seal, or otherwise restrict B.R.'s access to the bedroom closet, the living room closet, or the kitchen drawers and cabinets. Thus, B.R. enjoyed unfettered access to the entirety of the premises at 1419 Milan Street, apartment 205, and this Court finds that B.R. had actual authority to consent to a search of the apartment – specifically including the closets, drawers, and cabinets from which law enforcement recovered the illicit items.[39]

### D. Whether the Government's Search Exceeded the Scope of B.R.'s Consent

An individual who consents to a search may limit the scope of the search. *Florida v. Jimeno*, 500 U.S. 248, 252 (1991). However, where the individual's "consent would reasonably be understood to extend to a particular container [or area of the home], the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Id.* The crucial inquiry in a scope-of-consent analysis is whether a reasonable officer would have understood the individual's consent to extend to a particular area. *United States v. Rich*, 992 F.2d 502, 505 (5th Cir. 1993); *Jimeno*, 500 U.S. at 251.

Law enforcement's search of the apartment did not exceed the scope of B.R.'s consent. First, a reasonable officer would have understood her consent to extend to the closets and cabinets in her apartment. The ATF consent-to-search form which B.R. executed granted law enforcement

---

[39] In any event, even where a third party does not have actual authority to consent to a search, that person's consent may still be valid if the third party had apparent authority to consent to law enforcement's search. *Staggers*, 961 F.3d at 760. "Apparent authority exists when 'the searching officers reasonably (though erroneously) believed that the person who has consented to their search had the authority to so consent.'" *Id.* (internal quotation marks omitted) (quoting *Iraheta*, 764 F.3d at 463). It was objectively reasonable for law enforcement officers to believe that B.R. had the authority to consent to a search of unlocked closets and cabinets inside the apartment when they knew she held the lease and paid the utilities for that apartment. Therefore, even assuming *arguendo* that B.R. did not have actual authority to consent to a search of the premises at 1419 Milan Street, apartment 205, she had apparent authority to consent to such search, so the consent would still be valid.

14

consent to search "[t]he apartment complex located at 1419 Milan St.[,] New Orleans, LA 70115. Specifically apartment [205] rented by [B.R.]."[40] B.R.'s consent to search the entire apartment generally can, quite reasonably, be objectively understood to extend to "integral parts" of the residence, including closets and cabinets. *See United States v. Ibarra*, 948 F.2d 903, 906-07 (5th Cir. 1991) (finding that a defendant's consent to search his home, objectively understood, extended to "all integral parts of the house – closets, attic, and basement included").

Beyond the general principle that a resident's consent to search the home generally extends to integral features of the home such as closets and cabinets, the facts of this case further indicate the officers' reasonableness in understanding B.R.'s consent to search to extend to the closets in her apartment. First, B.R. approached law enforcement to file a complaint against Severin, and explained that she feared for her life partly due to his insistence on keeping dangerous weapons in the closets. It follows, then, that a reasonable officer would understand B.R.'s consent to search to extend to those areas she complained about to the officers. Second, B.R. was present at the apartment for the entirety of the search and never limited the scope of law enforcement's search. She cooperated when law enforcement asked her questions about the items they discovered. There is no evidence that she manifested any intent for the officers to refrain from searching any area of the apartment, including the closets or kitchen cabinets. As a result, this Court finds that law enforcement's search did not exceed the scope of B.R.'s consent, so the search was lawful.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Severin's motion to suppress (R. Doc. 103) is DENIED.

---

[40] R. Doc. 103-2 at 1.

New Orleans, Louisiana, this 5th day of December, 2025.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE